## SUPREME COURT.

### In the Matter of Alfred E. Lagrave.

The treaty between the governments of the United States and France, of February 24, 1845, provides for the demand of one power and the surrender by the other of persons accused of certain crimes. One such crime is *burglary*, which is defined to be the breaking and entering into a mansion-house of another by night, with intent to commit felony. This is a common-law offense and recognized as such by both governments.

But the crime of burglary in the third degree, under the statutes of the State of New York, is unknown to the common law; and there is no provision in the above mentioned treaty, and consequently no power for the demand and the extradition of a fugitive from one government to the other for such a crime.

Where the relator was indicted in New York on a charge of burglary in the third degree and forcibly seized in France and brought to New York under the form of the extradition treaty, and immediately on his arrival here was arrested in several civil actions, at the suit of a number of creditors for fraud in the purchase of goods here prior to his going to France, and was also arrested on a bench warrant by the sheriff of New York on the indictment for the crime of burglary in the third degree, and was imprisoned for want of bail:

*Held*, that the whole proceeding was illegal and unauthorized, and that the creditors who had procured and caused to be served the orders of arrest were responsible for the seizure of the relator on French soil, and for his extradition to the United States; and by the principle of several well considered authorities, such an abuse of process as to require the court to set aside the arrest. And the power of the court to do so, under the *habeas corpus* and *certiorari* acts, was ample and clear.

But it is no ground for discharging a prisoner in a *criminal matter* that he has been forcibly brought within the jurisdiction of the courts; here the extradition treaty does not apply in such a case. The prisoner was, therefore, remanded on the bench warrant served by the sheriff, charging him with burglary in the third degree.

*On habeas corpus and certiorari, July*, 1873.

THE facts will sufficiently appear in the opinion of the court.

In the Matter of Lagrave.

JOHN GRAHAM, E. T. GERRY and AMBROSE MONELL, *for petitioner*.

A. OAKEY HALL, *for the sheriff*.

WM. ALLEN BUTLER, *for the creditors*.

FANCHER, *J.*— The defendant had not, as the proofs show, committed any crime for which, under the treaty between the United States and France, he could be demanded by the one government or extradited by the other. The treaty of February 24, 1845, provides for the demand by one power and the surrender by the other of persons accused of certain crimes. One such crime is "burglary," which is defined to be the breaking and entering into a mansion-house of another, by night, with intent to commit felony. The crime is included, under the French law, in the words *vol qualifié crime* (8 *U. S. Stat. at Large, p.* 582, *p.* 617; *Whart. Confl. Laws*, § 942).

The offense of burglary is a common-law offense. It is essential to the crime that the house broken into be a *dwelling-house*, and that the time of entering be in the *night* (3 *Chitty's Crim. Law*, 1101, 1102).

The relator was charged and indicted for an offense which, by our New York statute, is defined as burglary in the third degree (2 *Rev. Stat.*, 669, § 17). This is only a statutory offense and was not known to the common law. The indictment against the relator of August 12, 1872, was for this particular, statutory offense, defined as burglary in the third degree. There is no averment that he broke into a dwelling-house nor that the time of the act was in the night. It is doubtful if the offense, as charged, could be sustained under the facts disclosed (*People* agt. *Fralick, Lalor's Supp.*, 63); but whether the facts will make out the statutory offense or not, it is quite certain the common-law offense of burglary is not charged, nor does the indictment allege it, nor does the treaty between the United States and France provide for the demand and extradition of a fugitive for our statutory

offense of burglary in the third degree.　The treaty refers to the common-law offense of burglary.

If no offense within the treaty was charged, time need not be spent in rehearsing the facts and circumstances touching the extradition of the relator and the bringing of him forcibly from France to the United States.

It is plain the proceeding was unauthorized and illegal. He was wrongfully seized and kidnapped in France through the instrumentality of James Mooney, an alleged detective, and by him was forcibly brought to the United States on the French steamer "Washington," without any charge having been made for which he could lawfully be extradited.

It must be conceded that if the creditors, who procured and caused to be served on the relator orders of arrest in civil actions, are responsible for the seizure of the relator on French soil and for his extradition to the United States, there has been, according to the principle of several well-considered authorities, such an abuse of process as will require the court to set aside the arrest.　But the counsel for the creditors has strenuously contended that none of the creditors nor their committee had anything to do with the criminal charge for which the relator was indicted, nor with the proceeding or instrumentality by which he was brought from France to the United States.　On the other hand, the relator and his counsel assert that the creditors and their committee, and they only, had all to do with the getting up of the criminal charge and with the so-called extradition proceedings.　Upon the determination of this disputed issue depends one of the principal questions in the case.

There is no doubt that the United States minister in France acted upon misinformation when he allowed the authority of his office to favor the relator's extradition.　The indictment and affidavit of Tafft, on which it was found, were insufficient to show any crime for which the defendant could be extradited. The affidavit of Tafft alleged that the offense was committed in 1871 ; the indictment averred it had been committed in

In the Matter of Lagrave.

1872. But neither the one nor the other made out the common-law offense of burglary.

The "decrête" put in evidence is dated on the 23d September, 1872, and the relator appears to have been arrested on the 9th September, fourteen days before. The arrest, therefore, was not because of, nor founded upon, the authority of the *decrête*, but the latter must have been procured as ancillary to the arrest, and because it was proper the French authorities should take action in their own tribunals, so that the *decrête* should operate as a warrant of extradition. The French authorities were in some way beguiled into the belief that the relator was accused of a crime within the international treaty, for the decrête assumes that the offense charged was within the treaty.

There is an act of congress (15 U. S. Stat. at Large, 337) which provides that "any person duly appointed as agent to receive in behalf of the United States the delivery by a foreign government of any person accused of crime committed within the jurisdiction of the United States, and to convey him to the place of his trial, shall be and thereby is vested with all the powers of a marshal of the United States in the several districts through which it may be necessary for him to pass with such prisoner, so far as such power is requisite for his safe keeping."

But if the custody which Mooney exercised over the relator was unlawful in the beginning, the statute of the United States just quoted could not make the custody lawful afterward. While on the steamer, which was a French vessel, the prisoner, in contemplation of law, was on French territory. Ships and vessels on the high seas are treated as a part of the territory of the country to which, according to their nationality, they belong (*Case of Atlanta*, 8 *Opin. Attorney-General U. S.*, 73; *In re Bennett*, 11 *Law Times R.* [*N. S.*], 488; *Queen* agt. *Anderson, Law Rep. Crown Cas.*, 161; *Reg.* agt. *Junnot*, 1 *Russ. on Crimes*, 4th ed., 153; *Arch. Crim. Pl.*, 16 ed., 395; *Reg.* agt. *Allen*, 1 *Moody Crown Cas.*, 494; *Thomas* agt.

In the Matter of Lagrave.

*Lane*, 2 *Sumner R.*, 1; *United States* v. *Coombs*, 12 Peters, 72). There was no arrest of the relator, therefore, which was lawful until he reached the jurisdiction of New York, and the question is, was he brought here under such circumstances as to make his arrest when here an abuse of process?

The principle of law applicable to the case. is. to be found in several authorities. There are adjudications on the subject both in England and the United States. They all illustrate the same principle. An arrest procured by fraud or trick is illegal.

· Where a party was brought from another state by virtue of a requisition from the governor on a criminal charge, and it appeared that the charge was made with the design of bringing such party within the jurisdiction of the court, that he might be held to bail in a civil suit, he was ordered to be discharged from arrest on common bail. Other cases are to the same effect (*Underwood* agt. *Felter*, 6 *N. Y. Legal Obs.*, 66; *Stein* agt. *Valkenheysen*, *Ellis*, *Blackburn & Ellis*, 65; *Goupil* agt. *Simonson*, 3 *Abb. Pr.*, 474; *Wells* agt *Gurney*, 8 *Barn. & Cress.*, 769; *Snelling* agt. *Watrous*, 2 *Paige*, 314; *Williams* agt· *Bacon*, 10 *Wend.*, 636 *; Benninghoff* agt. *Oswell*, 37 *How. Pr. R.*, 235; *Hill* agt. *Goodrich*, 32 *Conn.*, 588).

In one of these cases it was said that where a party has not in fact been guilty of a crime, a proceeding founded on the allegation that it was committed, which is a mere device to enable an arrest, is an abuse of process, and the arrest cannot be sustained. The legality of the arrest is, therefore, to be tested by the inquiry whether the creditors were concerned in the device by which the party has been brought within the jurisdiction of the court. If the criminal proceedings be a pretext to bring him within the jurisdiction, so that he may be proceeded against *civiliter*, and the creditors in whose suits the orders of arrest were issued instigated the criminal proceeding, and were instrumental in bringing the relator where the orders of arrest could be served, then the arrest was unlawful and cannot be maintained.

The counsel on both sides have substantially concurred in the principle of law applicable to the case, but they differ when the question of fact is raised as to the interference of the creditors in respect of the criminal charge and the extradition. To determine this question we must look at the facts as disclosed by the evidence in this matter.

Lagrave was a dealer in dry goods in the city of New York. In 1871 he had a place of business at 524 Broadway, and in 1872 at 448 Broome street. In the early part of 1872 he made large purchases of goods upon credit from leading importers in the city. On Sunday, the 26th June, 1872, he secretly absconded without paying or providing for his large indebtedness.

Shortly after his flight became known his New York creditors held a meeting at the office of Messrs. Alden & Co., 530 Broadway, when a committee was appointed. There were two subsequent meetings of the creditors at the St. Nicholas Hotel. The creditors then were ignorant of his whereabouts, and the testimony bears out the assertion of their counsel that "the object of the appointment of the committee was not the collection of the claims of creditors but to ascertain where Lagrave was, and, if possible, to procure his arrest and bring him to justice and punishment."

An agreement was made between themselves at the first meeting of the creditors to pay *five per. cent* on the several amounts of their respective claims; and at the second meeting they instructed their committee to put Lagrave in bankruptcy, and "take such steps as would bring him to punishment."

It appears that $6,000 or $7,000 were realized from the first subscription of five per cent. Afterward, in September, there was another meeting of the creditors at the St. Nicholas, when it was stated that the relator had been arrested at Luchon, in France, that the funds of the committee were exhausted, and if the creditors saw fit they could furnish

them with more money. A further assessment of three per cent was assented to and paid.

Several of the creditors testify that the object of appointing the committee was to bring this man, Lagrave, to justice. The creditors generally united in the appointment of the committee and agreed to the *pro rata* contribution to pay the expenses which might be incurred.

The committee retained as their legal adviser, John D. Townsend, Esq., and in accordance with his advice James Mooney was selected as a competent detective to find Lagrave. Mooney went to France in search of him. His instructions were to find him, if possible. It is not disputed that the expenses of Mooney were paid by the committee out of the fund contributed by the creditors. Mooney testified that he was employed to ascertain the whereabouts of Lagrave. One of the creditors, N. S. W. Vanderhoef, testifies that the committee was appointed to prosecute and take the business in hand, instead of each individual creditor looking after his own interest, prosecute Lagrave for thieving from his creditors. That was the motive. The money and who they should employ was left entirely with the committee. The particular proceedings, he says, were left to the committee. William Strong, the treasurer of the committee, states that the committee put the whole case into the hands of Mr. John D. Townsend, about the first of June, for the purpose of arresting and punishing Lagrave, if possible. He further says: "We put the whole matter into Mr. Townsend's hands, and we were to pay the cost of the thing." The money was expended under his instructions in the costs of the whole case. He called for money frequently by orders on Strong. Others of the committee relate the same facts as to the employment of Mr. Townsend, and confiding the whole case to his hands.

In one of the interviews of one of the committee with Mr. Townsend the latter said he had heard of a case of burglary at Thayer's store, and he presumed that was sufficient to bring him (Lagrave) out here. Mr. Field, one of the com-

mittee, testifies, page 315, "We understood that Mr. Town-
send was to have him brought back on that charge." In
September, following, Mr. Field learned from Mr. Townsend
that an indictment had been procured, who said one had
been procured "for the purpose of arresting and bringing
him back." Mooney swears that Mr. Townsend employed
him to go abroad in this matter about ten or twelve days
before he went. This makes the date of the employment
about the 5th June, 1872. He received money from Town-
send and left for Liverpool on the 15th June, 1872, with a
description and photograph of Lagrave, instructions from
Townsend and £225 in money. While he was abroad letters
and telegrams passed between him and Townsend.

All these steps, thus far, were taken by the creditors, their
committee and counsel. Nothing is heard of any public officer
or criminal proceeding until Mooney had arrived in France.

By the minutes of the grand jury of August 12, 1872, it
appears that an indictment was found on that day, on the evi-
dence of George H. Tafft, against Alfred E. Lagrave and
James D. Otis, for burglary in the third degree.

Mr. Townsend testifies in this matter, that it is very possi-
ble he did draw the original affidavit of George H. Tafft;
that he did draw the affidavit of one person and delivered it
to the district attorney; cannot say whether it was Tafft's or
Bassett's. The district attorney remembers Townsend spoke
to him about the case, but cannot say whether before or after
the indictment. He says there was a conversation with Town
send, which must have been *after* the indictment, about claim
ing Lagrave from the French government under the treaty
A letter was prepared by his clerk, or by Townsend, to the
secretary of state, p. 592.

The indictment charged that Alfred E. Lagrave, on the 4th
June, 1872, with force and arms, the store of Davis Thayer,
Jr., feloniously and burglariously did enter and break into,
then and there burglariously to steal and carry away certain
cases of hats.

In the Matter of Lagrave.

The affidavit of Tafft relates how certain hats were missed from the store of Thayer in June, 1871, and that one Tomlins, an employe of Lagrave, had informed him the missing goods had been found in the premises of Lagrave; and the affidavit contains other allegations of circumstances implicating Lagrave in the theft of the hats; and concludes by stating that, as deponent is informed, it is the desire of Thayer that Lagrave should be prosecuted, and " that said Lagrave is a fugitive now in France." According to an indorsement on the indictment, Thayer was in Massachusetts. Tafft went to France, and, as the relator testifies, he said that Bassett came to him and wanted him to go before the grand jury. He went, and John D. Townsend was there. The relator denies or explains the facts asserted in Tafft's affidavit as to the alleged burglary. Mooney states that he was present at Luchon, in France, with the chief of police, some police officers and a detective from Toulouse, when Lagrave was arrested, and that the chief of police and detective made the arrest. The prefect of police retained charge of the prisoner until October 14, when Mooney took charge of him. Mooney states that the arrest at Luchon was for burglary in New York on a man named Thayer.

After the arrest Lagrave was taken to Paris, from thence to Brest, where he was placed on the French steamer "Washington," and where, on the 14th October, 1872, Mooney took sole charge of him. Mooney's authority for keeping him in custody and bringing him to the United States was a decrête in French, dated September 27, 1872, a letter of Minister Washburn, dated October 11, 1872, and the verbal authority of Minister Washburn.

Mooney testifies that he told Minister Washburn he was directed by Townsend to go there and find Lagrave. He paid the expenses of Lagrave from the time he took him in custody until the arrival of the " Washington " at New York, on the 26th October, 1872. The amount for his own services and expenses was $4,000 or $5,000.

Some of the creditors learned through Townsend, some from one of the committee, and some from other sources, that Lagrave had been arrested and was being brought to New York on the " Washington," and they then applied to their lawyers, who procured orders of arrest. The orders of arrest were served immediately on his arrival in New York. Lagrave was first taken to the district attorney, and then to the office of the sheriff, where the orders of arrest were served.

This general outline of facts, without going into more particulars, shows plainly that the committee of the creditors, and primarily the creditors themselves, were the parties who caused the arrest and extradition of Lagrave.

Had he not defrauded them, no meetings of creditors would have been held, no subscriptions made, no committee appointed, no counsel employed, no affidavits drawn for the grand jury, no indictment found, no detective engaged, and no arrest or extradition achieved. Nor would the relator have been pursued or brought to the United States, but for the money which the creditors paid and caused to be applied for the purpose. He may not have been overtaken with anything exceeding his deserts. He fraudulently contracted the debts which he owes the creditors, and he absconded as a fraudulent debtor. But those are facts that cannot legally excuse a device to bring him into the jurisdiction of the court for the purposes of arrest in civil actions, if the device has no meritorious foundation.

The arrival of the steamer was announced, and, before Lagrave had been loosed from the confinement and arrest, begun in France, continued on the voyage to the United States, and still enforced when he was taken from the vessel to the district attorney and to the sheriff's office, the orders of arrest were served. He has since been in the custody of the sheriff, and in confinement in Ludlow street jail for want of bail, .on the orders of arrest.

Now, had all these facts appeared before the court, on

In the Matter of Lagrave.

motions, made in the several actions wherein the orders issued, to *set aside the service of the orders of arrest* on the ground of abuse of process, I cannot say the motions should not prevail. But the application before me is not a motion in any of the actions. It is made in the proceeding instituted by the writs of *habeas corpus* and *certiorari;* and the question arises whether I can go behind the return which sets forth regular orders of arrest and the detention, by the proper officer, of the relator thereon.

Section 39 of the *habeas corpus* act provides that "if no *legal` cause* be shown for such imprisonment, or for the continuance thereof, such court or officer shall discharge such party from the custody or restraint under which he is held" (2 *Edm. Stat.*, 588 [*same as* § 54 *in* 3 *R. S.*, *5th ed.*, *p.* 887]).

But, in this case, "*legal cause*" for the imprisonment and restraint, it is contended, is shown in the orders of arrest which are set forth in the return.

It is provided, by section 41 of the habeas corpus act, that if the prisoner be in custody on civil process from any court legally constituted, or issued by any officer in the course of judicial proceedings before him, authorized by law, such prisoner can only be discharged in one of the six cases mentioned in the statute.

It must be conceded that the orders of arrest, granted by a justice of the supreme court, were issued by an officer having jurisdiction; and also that the facts, constituting the cause of arrest, were sufficient for the exercise of the officer's discretion to issue the orders. They are likewise sufficient on their face, being in due form, and, consequently, are a sufficient protection to the sheriff.

The imprisonment is, therefore, lawful until the arrest is set aside (*People* agt. *Nemis*, 1 *Hill*, 154; *People* agt. *McLeod*, *id.*, 377; *S. C.*, 25 *Wend.*, 483; *People* agt. *Cassells*, 5 *id.*, 168; *Matter of Prune*, 1 *Barb.*, 340; *Matter of Clark*, 9 *Wend.*, 212; *Sheriff of Middlesex*, 11 *Ad. & El.*, 273; *Ex parte Kearney*, 7 *Wheat.*, 38).

The case is one where the relator is in custody on civil process, issued by an officer in the course of judicial proceedings before him, authorized by law; and it is contended by the creditors that, unless it appear that the case falls within one of the six subdivisions of section 41, it is the requirement of the statute that the relator shall be remanded.

The counsel for the relator claim, however, that relief can be had in this proceeding, and they cite the sixty-eighth section of the habeas corpus act (3 *R. S.*, *5th ed.*, *p.* 889, § 369), which reads as follows: " If it appears that the person detained is *illegally* imprisoned, confined or restrained of his liberty, the court or officer shall grant a writ of discharge, commanding those having such person in custody to discharge him forthwith."

In *People ex rel. Ritterman* agt. *Kelly* (1 *Abb. Pr. R.* [*N. S.*], 435) the late city judge discharged the relator on *habeas corpus,* where it appeared by the return that he was in custody under nine orders of arrest; but in respect of which it was shown, on traverse to the return, that the causes of action arose prior to his discharge as an insolvent debtor.

There are various other authorities bearing upon the question, the most prominent of which are these: *Ex parte Beatty* (12 *Wend.*, 229); *Squire's Case* (12 *Abb. Pr. R.*, 38); *Caldwell's Case* (35 *Barb.*, 444 [*S. C.*], 13 *Abb.*, 405); *People ex rel. Burroughs* agt. *Willett* (26 *Barb.*, 78); *People* agt. *Rawson* (61 *id.*, 625); *Bonner* agt. *People* (4 *Barb.*, 33).

In *Squire's Case* (12 *Abb. Pr. R.*, 38) it was held that if the prisoner was arrested in violation of his privilege he was entitled, on habeas corpus, to his discharge. The party, in that case, was exempted from arrest under the metropolitan police act.

There is another section of the habeas corpus act which, it seems to me, bears upon the case, although it has not been referred to by counsel. Section 64 (3 *R. S.*, *5th ed.*, *p.* 889) provides that the party may allege any fact to show, either that his imprisonment or detention is unlawful, or that he is

In the Matter of Lagrave.

entitled to his discharge; and thereupon the court or officer is directed to proceed in a summary way to hear the proofs and allegations, "and to dispose of such party as the justice of the case may require."

This provision is so broad that it seems to confer ample authority on *habeas corpus* and *certiorari*, not only to inquire into the cause of the imprisonment and detention, but to hear all the facts touching the same, and to dispose of the party as the justice of the case may require.

In 1 *Hill* (*note, p.* 647, 666) it is said: " If the party be illegally arrested or detained, though the process be valid, this is ground for discharge."

Authority for this proposition is cited in *Pleasant's Case* (11 *Am. Jur.*, 257), where the party was discharged on *habeas corpus* because the arrest had been made without the territorial jurisdiction of the court.

Although motions to set aside the service of the orders of arrest could be made in the several actions wherein they were issued, still I am of the opinion that the party arrested may resort to *habeas corpus* and *certiorari*, and, in that proceeding, may show any facts which entitle him to his discharge; and the court or officer, before whom the proceeding is brought, is bound summarily to hear and adjudicate upon the facts, and to dispose of the party as the justice of the case may require.

Where the arrest or detention is illegal the right of the party to his discharge is absolute; and it was not intended that he should be compelled to resort to any other proceeding to procure it than the proceeding on *habeas corpus* and *certiorari* (*see People ex rel. Burroughs* agt. *Willett*, 26 *Barb.*, 78; *Caldwell's Case*, 35 *id.*, 444; *People ex rel. Ritterman* agt. *Kelly*, 1 *Abb. Pr. R.* [*N. S.*], 435).

The result of these remarks is, that the relator was not legally arrested on the several orders of arrest mentioned in the return; and, so far as he is imprisoned or detained because of them, he is entitled to his discharge.

But there is another cause of detention set forth by the respondent in his return, for which I think the relator must be remanded.

The return of the sheriff sets forth that he arrested the relator and took him into custody under and by virtue of certain orders of arrest, copies of which are annexed to the return, and that he holds and detains said relator in custody by virtue of said orders; and also, by virtue of a certain warrant issued by the people of the state of New York, a copy of which is also annexed to the return. ·

The warrant is a bench-warrant, issued by the district attorney for the county of New York, commanding the sheriff, etc., to take the body of Lagrave, who stands indicted for burglary, and to bring him before the justices of the general sessions of the peace, in and for the city and county of New York, to be dealt with according to law.

Where a prisoner is without the jurisdiction of the court, and is by force or fraud brought within it, he cannot be arrested and proceeded against in a civil action, at the suit of any party concerned in bringing him within such jurisdiction. But, in respect of a criminal offense, this rule has no application (*Susannah Scott's Case*, 9 *Barn. & Cres.*, 446; *People, ex rel. Luddington* agt. *Sheriff of N. Y., MSS.*, FITHIAN, *J.*)

It is no ground for discharging a prisoner from arrest in a criminal matter, that he has been forcibly brought within the jurisdiction (*The People* agt. *Wm. G. Rowe*, 4 *Park. Crim. R.*, 253).

In the civil actions, the improper proceeding of the plaintiffs, which would amount to an abuse of process, is a legal wrong which prevents them from retaining the benefits of an arrest. But there can be no wrong of that nature imputable to the people. The process upon which he is held, issued by the district attorney, is valid, and the court or officer cannot, on *habeas corpus* or *certiorari*, inquire into the truth of the crime for which the prisoner stands indicted (*The People* agt. *McLeod*, 1 *Hill*, 377; *Matter of Clark*, 9 *Wend.*, 212).

In the Matter of Lagrave.

The question of his guilt or innocence must be tried according to law (2 *R. S.*, 737, § 1).

It is argued that he cannot be tried because the indictment is lost. Perhaps the public prosecutor may be able to substitute a copy of the indictment (*People* agt. *Burdick*, 3 *Caines*, 104).

The indictment cannot be questioned collaterally (*People* agt. *Hurlburt*, 4 *Denio*, 136; *Bank of U. S.* agt. *Jenkins*, 18 *Johns.*, 309).

It is further alleged that there is no intention to try the relator on the indictment, and that the time which has elapsed since the warrant was delivered to the sheriff entitles him to be discharged.

That may be true; but the motion for a discharge on such grounds must be made to the court wherein the criminal proceeding is pending. That court has full control of the indictment and all proceedings founded upon it.

The relator must be discharged from the orders of arrest in the civil actions, but remanded to the custody of the sheriff on the warrant issued on the indictment in the general sessions against him, with directions to the sheriff to take the relator before that court to answer the indictment.